UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO HOLGUIN GARCIA,<br><br>Petitioner,<br><br>v.<br><br>ANTHONY HEDGPETH, Warden,<br><br>Respondent. | Case No.: 1:12-cv-00629-AWI-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation following conviction in a jury trial for second degree murder (Cal. Pen. Code § 187(a)). (Doc. 14, Ex. A, p. 4). He was sentenced to an indeterminate sentence of 30 years-to-life, plus determinate sentences of five years for a prior felony conviction enhancement and three years for a prior conviction for which he was on probation

Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed Petitioner's conviction on April 7, 2011. (Doc. 14, Ex. A). He then filed a petition for review in the California Supreme Court that was summarily denied. (Lodged Document ("LD") 5, 6).

1

On April 20, 2012, Petitioner filed the instant petition, raising a single issue of prosecutorial misconduct. (Doc. 1). Respondent's answer was filed on July 16, 2012. (Doc. 14). Petitioner did not file a Traverse. Respondent does not contend that the sole ground for relief in the petition has not been fully exhausted. (Doc. 14, p. 2).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

Between 7:00 and 8:00 a.m. on January 11, 2009, Mr. Vang went out for his usual morning walk, which may have included gathering aluminum cans in the neighborhood for money. In his early 60's and very thin, Mr. Vang was 5 feet 5 inches tall and weighed only 88 pounds. He did not return home. His body was found lying next to a trash bin, or dumpster, in the alley between two apartment buildings at 2020 and 2030 East White Avenue.

Fresno Police Department Detective Mark Yee was called to the scene to investigate the homicide. Yee found blood stains around Mr. Vang's body in the alley, including splattered blood on the concrete and on the side of the dumpster. A later autopsy showed that Mr. Vang had been severely beaten with forceful blows to the head, neck and face. The injuries were consistent with the victim being hit with a blunt object like a baseball bat or being repeatedly kicked in the head, neck and face.

Physical evidence collected at the scene included a converted golf club lying across Mr. Vang's legs and a broken cinder block. Detective Yee also found a bloody shoe print on the concrete in the alley near the body. The shoe print was pointing in the direction of apartment 101 which was the only unit actually being occupied in the complex at 2020 East White Avenue at that time.

A second homicide detective, Jennifer Federico, contacted the residents of apartment 101. It was learned that Esperanza Diaz (China) lived in apartment 101 with her mother. China was the girlfriend of appellant's brother, Gabriel Garcia (Gabriel). The night before Mr. Vang was killed, appellant attended a party at China's apartment (apartment 101) with Gabriel and others. Maria Diaz, appellant's girlfriend and China's sister, also attended the party. Maria said that she and appellant both got drunk at the party. Appellant left the party at around 8:00 or 9:00 that night and did not arrive back at his residence on Verrue Avenue, where he lived with Maria, until the following afternoon. When he returned to the Verrue Avenue residence, appellant was wearing blue jeans, white tennis shoes and probably the jacket he "always" wore.

Appellant's younger brother, Freddy A. (Freddy), attended the party at apartment 101.1 He left the party at 6:30 p.m. and returned to apartment 101 the next day. Officers at the scene questioned Freddy to find out if he had heard or seen anything relating to Mr. Vang's homicide. Freddy was taken to the Fresno Police Department for further questioning and during a recorded interview with Detectives Yee and Ray Villavazo, Freddy told them that he had overheard a conversation between appellant and Gabriel in which appellant admitted to beating up an old man in the alley. In that conversation, appellant told Gabriel that he saw the old man walking in the alley "in the garbage can," got mad and "socked him up." Appellant told Gabriel that he and a friend, or "home boy," had beaten the old man.

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

Following the interview with Freddy, Detective Yee and other officers went to appellant's residence on Verrue Avenue and arrested appellant. Appellant's jacket and white tennis shoes were seized as evidence. Yee noted that appellant's tennis shoes were soaking wet and concluded that they had been recently washed. Also, Yee observed that the pattern on the soles of the tennis shoes was identical to the pattern in the bloody shoe print seen on the concrete near Mr. Vang's body. Blood was found on appellant's jacket, and subsequent tests confirmed that the DNA matched that of the victim, Mr. Vang.

The only defense witness was David Hart, who had been installing carpet in one of the apartments on East White Avenue on January 9, 2009, when he heard a commotion and saw an elderly Hmong man carrying a bag full of bottles and cans. Two Hispanic "kids," 16 or 17 years old, were "messing" with the old man, trying to get his bottles and cans away from him. Hart told them to leave the man alone or he would call the police, and the kids ran off. The old man began to cry and Hart asked if he needed help. The man declined and went into his apartment in the complex. Hart identified Mr. Vang as the elderly Hmong man he saw on January 9, 2009, but said that appellant was not one of the two kids that had harassed Mr. Vang that day.

On November 23, 2009, the jury found appellant guilty of second degree murder (Pen.Code, § 187, subd. (a)).2 On January 4, 2010, the trial court denied appellant's motion for a new trial and imposed sentence. Appellant was sentenced to 30 years to life on the murder count, plus five years for the prior felony conviction allegation. He also received an additional three-year term on a robbery case for which appellant was on probation. Appellant filed a timely notice of appeal.

(Doc. 14, Exh. A, pp. 2-4).

## DISCUSSION

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000). Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Harrington, 131 S.Ct. at 786. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's

claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

**III.  Review of Petitioner's Claims.**

Petitioner alleges the prosecution engaged in misconduct by introducing evidence of gang membership, by referencing a "racial" motive for the crime, by making Biblical references during closing argument, and by expressing his personal belief in Petitioner's guilt to the jury. (Doc. 1 at 5-6).

A.  Prosecutorial Misconduct.

Petitioner contends that the prosecution engaged in misconduct during the trial and that such misconduct cannot be considered harmless error.  The Court disagrees.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Our Supreme Court recently summarized the applicable state and federal law standards regarding claims of prosecutorial misconduct:

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights ... but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (People v. Riggs (2008) 44 Cal.4th 248, 298.)

The usual rules of forfeiture apply to such claims. Thus: "'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]'" (People v. Stanley (2006) 39 Cal.4th 913, 952.)

With these principles in mind, we now consider the specific instances of alleged prosecutorial misconduct.

I. Introduction of Gang Evidence

Defendant's first contention is that the trial court prejudicially erred when it denied his motion for mistrial relating to the prosecutor's alleged introduction of gang evidence. "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation]' [Citation.]" (People v. Collins (2010) 49 Cal.4th 175, 198.) A motion for mistrial should be granted when a defendant's chances of receiving a fair trial have been irreparably damaged. (Ibid.; People v. Ayala (2000) 23 Cal.4th 225, 282.) A trial court's denial of a mistrial motion is reviewed under the abuse of discretion standard. (People v. Ayala, supra, at p. 282.)

During in limine proceedings, the trial court granted defense counsel's motion to exclude any reference to appellant's active membership in the Eastside Fresno Bulldogs gang. At trial, crime scene technician Kathy Ens testified regarding items that she collected as evidence from appellant's Verrue Avenue residence. One of the items was a photograph found in a bedroom, referred to at trial as exhibit No. 91A. The photograph depicts a group of four individuals, including appellant, a younger boy (Freddy), and two smaller children sitting together on a bed. In the picture, appellant and Freddy are wearing red shirts and an infant child in appellant's lap is wearing a red hat with a bulldog emblem. Appellant is shown smiling and making a gesture in which his middle finger is extended upward, and Freddy is grinning and making a different kind of hand gesture.

At a recess following Ms. Ens's testimony, defense counsel moved for a mistrial based on the fact that exhibit No. 91A was published to the jury. Defense counsel argued that the picture violated the trial court's order excluding gang evidence because it showed appellant and Freddy wearing red shirts and it showed Freddy making gestures that could be interpreted as "gang sign[s]." The trial court disagreed, pointing out that there had been no testimony telling the jury that anything in the photograph potentially indicated gang involvement. Furthermore, the hand gesture made by Freddy, whatever its meaning, could not reasonably be attributed to appellant, and there was no reason for the jurors to conclude it was anything sinister. Also, the trial court reminded defense counsel that the photograph in exhibit No. 91A had been known to defense counsel prior to its being introduced and no objection was raised.

The trial court also noted the photograph was relevant because it was found at the Verrue Avenue residence and was therefore an indicator of appellant's connection to that residence, where other important evidence was found. It also portrayed a close relationship between appellant and Freddy (both are smiling in the photograph and making gestures), which was

6

relevant because Freddy's trial testimony was expected to differ from what he told police officers at the time of the investigation. The trial court concluded that the photograph was not gang evidence and was not prejudicial. Accordingly, the trial court denied the motion for mistrial.

We agree with the trial court that the introduction of the photograph did not prejudice appellant or deprive him of a fair trial. No testimony was presented in the case regarding gangs, gang colors or gestures. No one testified that appellant was a member of any criminal gang or that anything in the photograph indicated possible gang membership. In such a context, we do not believe the photograph alone would have led lay jurors to conclude that appellant was a member of a criminal gang. Although it is true the photograph pictured appellant and Freddy wearing red shirts and Freddy making an unidentified hand gesture, etc., by itself, the photograph was simply too indefinite and inconclusive to have led jurors to assume that appellant was likely a gang member. Also, as noted by the trial court, the photograph was relevant for reasons that had nothing to do with gangs. We conclude that the photograph did not constitute improper gang evidence and that its introduction into evidence was not misconduct.

In any event, even assuming hypothetically that the photograph was suggestive of appellant's gang-member status and should not have been introduced into evidence, its publication to the jury was not prejudicial in this case. The photograph was only briefly before the jury's eyes, its probative value as evidence of gang status was at best relatively limited or remote, and in light of the significance of other evidence, it was not something upon which the jury would likely have focused much attention. Above all, it was not prejudicial because other evidence clearly and overwhelmingly established appellant's guilt. "The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded." (People v. Avitia (2005) 127 Cal.App.4th 185, 194.) In light of the strong and compelling evidence of guilt that included Freddy's statement that he overheard appellant admitting he beat up an old man in the alley, the DNA match confirming that Mr. Vang's blood was on appellant's jacket, and Detective Yee's testimony that the pattern on appellant's tennis shoes was identical to the pattern in the bloody shoe print found on the concrete near Mr. Vang's body, we conclude that even if error occurred, there was no prejudice.

For all of these reasons, the motion for mistrial was properly denied.

Appellant adds a further contention. He claims on appeal that the prosecutor committed a second violation of the trial court's no-gang-evidence order by introducing Freddy's police interview, in which the interviewing officer and Freddy briefly referred to appellant's friend and possible accomplice in the beating as appellant's "home boy." The claim of error was forfeited by failure to object or otherwise raise the issue below. (People v. Stanley, supra, 39 Cal.4th at p. 952.) Additionally, it is clear from the entire interview that the term was being used as synonymous with "friend," and there is no reason to believe the jury understood the phrase to mean a fellow gang member. Thus, even if the claim had not been forfeited, appellant failed to show prejudice.

II. Prosecutor's Comment During Opening Statement

Appellant claims the prosecutor committed misconduct of a prejudicial nature during the opening statement and that, as a result of that misconduct, the trial court should have granted appellant's motion for a new trial. (§ 1181, subd. 5 [new trial may be granted if prosecutor "has been guilty of prejudicial misconduct during the trial thereof before a jury"].) On appeal, a trial court's denial of a motion for new trial is reviewed for abuse of discretion and will not be disturbed unless """a manifest and unmistakable abuse of discretion clearly appears."""" (People v. Guerra (2006) 37 Cal.4th 1067, 1159–1160.)

7

During his opening statement, the prosecutor made the following remarks regarding the unknown motive for the crime: "This ... case is about a chance encounter. I'm not saying that if it weren't for bad luck I wouldn't have any, but that was Mr. Vang that particular morning. There's no evidence that [appellant] set out, thought about it the night before, thought about it an hour before to go kill Mr. Vang. We can speculate on the reasons why he did it. Mr. Vang looks different, talks different, sounds different, he was from a different immigrant group."

At that moment, defense counsel objected to the prosecutor's "[i]mproper argument," and the trial court sustained the objection, explaining that "speculation is probably not something for an opening statement." The prosecutor said "[s]ure," and quickly clarified that his "point" was only that "you're not gonna hear evidence of what that reason was." No admonition was sought, but the trial court did twice instruct the jury that they must decide the case based solely on the evidence and that nothing the attorneys said, including remarks made during opening and closing statements, constituted evidence.

In his motion for new trial, appellant claimed that the prosecutor's comment during the opening statement improperly suggested to the jury that Mr. Vang's murder was racially motivated. The trial court rejected appellant's argument. The trial court noted that, in context, the comment did not convey to the jury that the crime was racially motivated, but only that there was no evidence of any motive for the crime. That is, although the People did not have to prove a motive, the prosecutor was letting the jury know that the People had no explanation for why somebody beat a defenseless old man to death. When, in elaborating that the motive was unknown, the prosecutor started to speculate, defense counsel's prompt objection was immediately sustained and the prosecutor moved on. In denying the motion for a new trial on this ground, the trial court concluded that "to say that that was somehow stimulating some kind of racial animus or trying to encourage the jurors to convict [appellant] because they should believe that he engaged in some sort of racial attack ... is a huge stretch based on the state of the record." (Italics added.)

Appellant contends that the race comment made in opening statement constituted prejudicial and reversible misconduct by the prosecutor and the trial court erred when it denied the motion for new trial on this ground. We disagree.

"'[P]rosecutorial misconduct in an opening statement is not grounds for reversal of the judgment on appeal unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial.' [Citation.]" (People v. Wrest (1992) 3 Cal.4th 1088, 1109.) "When a claim of misconduct is based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.]" (People v. Friend (2009) 47 Cal.4th 1, 29.)

We agree with the trial court's analysis of this issue. The obvious message that the prosecutor was communicating to the jury was that there was no known motive for the killing; that is, the People had no evidence of any motive. In elaborating further on that point, the prosecutor unfortunately expressed the matter with statements to the effect that while one could only speculate as to a possible motive, there was no evidence of one. The prosecutor's off-hand and speculative remark about race was in that limited context, it was met with a prompt and sustained objection, and the trial court instructed the jury that statements of counsel were not evidence. It was never again mentioned in the trial. In light of the entire context, the prosecutor's isolated and fleeting remark in his opening statement was not misconduct, but even if it was, there was no prejudice. The jury would not have construed the remark as meaning that there was a racial motive for the crime. Furthermore, any possible uncertainty on that issue was promptly and firmly dispelled by the sustained objection and the trial court's further instructions to the effect that the jury must only consider evidence and the attorney's statements are not evidence. The trial court did not abuse its discretion in denying the motion for new trial on this ground.

III. Prosecutor's Expression of Personal Belief in Appellant's Guilt

Appellant contends the trial court erred by failing to grant his motion for a new trial based on other alleged prosecutorial misconduct—namely, the prosecutor's statement to the jury during closing argument that "[w]e" all know appellant beat Mr. Vang to death. Appellant's contention is without merit.

"'A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial.' [Citations.] The danger that the jury will view the prosecutor's expressed belief in the defendant's guilt as being based on outside sources 'is acute when the prosecutor offers his opinion and does not explicitly state that it is based solely on inferences from the evidence at trial.' [Citations.] Nevertheless, not all such comments are improper. Rather, '[t]he prosecutor's comments must ... be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to the evidence presented at trial.' [Citations.]" (People v. Lopez (2008) 42 Cal.4th 960, 971.)

Here, in his rebuttal to defense counsel's closing argument, the prosecutor stated as follows: "Va Ger Vang, 88 pound, 63–year–old Hmong man who didn't deserve to die the way he did. Everybody agrees with that. He didn't deserve to have [appellant] beat him to death. We all agree to that. We all know that's what happened here." Appellant objected that this was "[i]mproper argument," and the trial court responded, "It's argument, Counsel." The trial court later revisited the issue and explained that the prosecutor was merely speaking in the collective "'we,'" referring to the jury. That is, rather than referring to the prosecutor's own personal beliefs, the phrase "'we know' [was] essentially saying, 'we,' 'all of us,' 'collectively,' 'the 12 of you,' know what happened. That is a fair argument."

Appellant raised the issue in his motion for new trial. The trial court once again rejected appellant's claim. The trial court noted that, in context, the prosecutor's argument meant that because of the strength of the evidence of guilt, "we all know" what happened. It was therefore a comment on the strength of the evidence at trial. The "point of the argument was that they, the jurors, all know it." The prosecutor's argument did not in any way suggest that the prosecutor had an additional source of information or evidence to support the finding that appellant was guilty. Therefore, there was no misconduct.

On appeal, appellant argues that these remarks conveyed the prosecutor's personal beliefs and did so in such a way that the jury may have concluded they were based on evidence not before the jury. We disagree.

"'The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it.'" (People v. Collins, supra, 49 Cal.4th at p. 213.) Here, the evidence of appellant's guilt was strong and compelling. The prosecutor was merely commenting on that fact using a collective form of expression (i.e., "we all know") as a way of saying, in effect, that the jury knew from the overwhelming evidence that appellant was guilty. In context, the jury would not have interpreted the prosecutor's argument as a statement of personal beliefs derived from evidence the jury never heard. We conclude there was no misconduct. The trial court did not abuse its discretion in denying the motion for new trial on this ground.

IV. Biblical and Other Historical References

Lastly, appellant argues the prosecutor committed prejudicial misconduct by referring to the Code of Hammurabi and the Bible. We disagree. In closing argument, the prosecutor briefly alluded to ancient codes that he characterized as "draconian" "strict responsibility" codes because, as the prosecutor understood them, they did not recognize lesser degrees of culpability

based on a consideration of a perpetrator's mental state, as current law does. Thus, the prosecutor referred to ancient strict liability codes for purposes of comparison, to emphasize the fact that current law considers the state of mind of the perpetrator and recognizes that there is less culpability for manslaughter as opposed to murder.

Appellant moved for a new trial on the ground that the prosecutor was using Biblical language ("an eye for an eye") as a coded message to jurors to disregard the law and take vengeance on appellant. The trial court flatly rejected that argument. The trial court found that the prosecutor's argument was not an appeal to religious authority nor a request that jurors invoke an ancient or Biblical maxim in punishing appellant, but was "instead an attempt to illustrate to the jurors what their actual burden was, what the actual burden of the People was."

The trial court's ruling has not been shown to be in error. Under the circumstances, the prosecutor's reference to ancient laws was not an appeal to a higher authority or an attempt to cause the jury to follow a Biblical maxim. The reference was plainly illustrative only, to clarify the present state of the law. We conclude there was no misconduct, and appellant was not prejudiced by the mention of ancient codes for illustrative purposes. (People v. Abilez (2007) 41 Cal.4th 472, 527.) The trial court did not abuse its discretion in denying the motion for new trial on this ground.

(Doc. 14, Ex. A, pp. 5-15).

        2.  <u>Federal Standard</u>.

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)); <u>see</u>, <u>Bonin v. Calderon</u>, 59 F.3d 815, 843 (9th Cir. 1995). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375 (1985)). Under this standard, a petitioner must show tthere is a reasonable probability the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety; the verdict probably would have been different.

Regarding a prosecutor's solicitation of inadmissible evidence, the admission of evidence in a state criminal proceeding is not subject to federal habeas review unless a specific federal constitutional guarantee is violated or the error is of such magnitude that the result is a denial of fundamental due process and the right to a fair trial. See <u>Estelle</u>, 502 U.S. at 67; <u>Colley v. Sumner</u>, 784 F.2d 984, 990 (9th Cir. 1984); <u>Jefferies v. Blodgett</u>, 5 F.3d 1180, 1192 (9th Cir. 1993). State law foundational and admissibility questions raise no federal question. <u>Johnson v. Sublett</u>, 63 F.3d 926, 930 (9th Cir. 1995). Since this ground for relief pertains to an issue of evidentiary error, Petitioner fails to raise a federal

1  question as required for federal habeas review.

2  However, in <u>Payne v. Tennessee</u>, the Supreme Court stated that if evidence introduced at a
3  criminal trial "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process
4  Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. 808, 825, 111 S.Ct.
5  2597 (1991) (citing <u>Darden v. Wainwright</u>, 477 U.S. 168, 170-83, 106 S.Ct. 2464 (1986)). <u>Darden</u>
6  provides that the "relevant question" is whether admission of the challenged evidence "so infected the
7  trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181, 106
8  S.Ct. 2464; <u>Romano v. Oklahoma</u>, 512 U.S. 1, 12, 114 S.Ct. 2004 (1994) ("The relevant question in
9  this case . . . is whether the admission of evidence regarding petitioner's prior death sentence so
10 infected the sentencing proceeding with unfairness as to render the jury's imposition of the death
11 penalty a denial of due process").

12  3. <u>Analysis</u>.

13  The success of this claim, as presented by Petitioner, hinges entirely upon this Court agreeing
14 with Petitioner's narrow and highly prejudicial interpretations of the comments and evidence of the
15 prosecutor, interpretations that are at variance with the state appellate court's common sense
16 interpretation of those same comments and evidence regarding what a reasonable juror would have
17 understood about those comments and evidence.

18  First, the 5th DCA concluded that the photograph of Petitioner, which he insists constitutes gang
19 evidence, did not imply that Petitioner was a gang member, there was no evidence presented at trial that
20 Petitioner was involved with a street gang, and the purported "signs" made by Petitioner and another
21 person in the photograph would not reasonably have been understood by jurors as "gang signs."
22 Moreover, as the trial court noted, the photograph was crucial evidence connecting Petitioner to the
23 residence in which other incriminating evidence was found and establishing Petitioner's friendship with
24 a prosecution witness whose testimony was expected to change from when he was first interviewed by
25 police, thus providing the prosecution with a theory for the witness's divergent accounts of events.

26  Petitioner also contends that a police interview, in which a witness, Freddy, and a police officer
27 referred to one of Petitioner's friends as "home boy" constitutes gang evidence. The 5th DCA
28 dismissed this contention, noting that the jury would simply have understood this reference to equate

with "friend."  Again, no other evidence was presented at trial to guide the jury in understanding that the term "home boy" may have a specific meaning among gang members, and there is no reason to believe, based on the transcript of the trial, that jurors so understood the phrase.  That being the case, the state court's interpretation of the phrase was not objectively unreasonable.

As to the prosecutor's comments in his opening statement that the State had no evidence regarding motive, but noting that the victim looked, acted, and talked differently (as a Hmong native), Petitioner contends that the prosecution was suggesting a racial motive for the murder.  The 5th DCA noted that the defense objection was immediately sustained, the jury was instructed that statements of counsel were not evidence, that they were to decide the case only on evidence, and the issue of race was never mentioned again.  The appellate court agreed with the trial court that, under all the circumstances, the prosecutor's words, while perhaps ill-chosen, were simply intended to explain that the State had no motive for the killing and that any motive found by the jury would be based on mere speculation, and were not intended to suggest a racial motive for the murder.

Regarding the prosecutor's use of the pronoun "we" in commenting that "[the victim] didn't deserve to have [Petitioner] beat him to death. <u>We</u> all agree to that. <u>We</u> all know that's what happened here" (emphasis supplied), the 5th DCA summarily rejected this contention as a due process violation, noting that the prosecutor was referring to the "collective we" in addressing the jury and was not expressing any personal belief in the guilt of Petitioner.

Finally, regarding the prosecutor's references to the Biblical maxim of "an eye for an eye" and the Code of Hammurabi, the 5th DCA rejected Petitioner's contention that the prosecutor was sending a "coded" message to jurors to seek vengeance on Petitioner.  Rather, the appellate court reasoned, the prosecutor was distinguishing older historic and Biblical moral codes that did not permit reduced degrees of culpability, as does California law.  This is an eminently reasonable interpretation of the prosecutor's comments when viewed in context.  Moreover, the jurors were fully instructed on the applicable burden of proof and the elements of the offense.

As can be seen from the above discussion, all of the comments and evidence objected to by Petitioner as being intentionally prejudicial have alternative, and non-prejudicial, interpretations that were accepted by both the state trial and appellate courts.  Under the AEDPA's deferential standard,

this Court's review does not involve a determination whether the state court's interpretation of these undisputed facts was right or wrong, but is more narrowly centered on whether or not the state court's interpretation of these facts was objectively reasonable. The interpretations endorsed by the state courts are, as discussed above, inherently thoughtful, realistic, and objectively reasonable. Although Petitioner attributes a more sinister and negative construction to those comments and evidence, the record and circumstances of the case do not weigh in his favor. However, as mentioned, the issue is not whether Petitioner or the state court is "right" about the construction, but only whether the state court's construction is objectively reasonable. It seems to the Court beyond dispute that the state court's interpretation is objectively reasonable. Thus, there is no basis upon which to grant habeas relief on this claim of prosecutorial misconduct.

Under all the circumstances, the Court agrees with Respondent that reasonable jurists could have concluded, as did the state courts, that the prosecutor's comments in closing argument were just that, i.e., argument, not misconduct, and that, even if considered to be misconduct, they were not "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. at 765. Accordingly, no federal due process violation occurred. Hence, the petition should be denied with prejudice.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within 21 days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within 10 court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.

Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:  **November 5, 2014**                    **/s/ Jennifer L. Thurston**
　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE